IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| SHERRIE JOHNSON, as administratrix of the Estate of ALQUWON JOHNSON, deceased,<br>     Plaintiff,<br>v.<br><br>RYAN CONNER; SONYA MAYO; BARBOUR COUNTY; GEORGE PARHAM; BARBOUR COUNTY COMMISSION, et al.,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No. 2:12cv392-WHA<br>)<br>)   (wo)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This cause is before the court on a Motion for Summary Judgment filed by Barbour County and the Barbour County Commission (Doc. #88), and a Motion for Summary Judgment filed by Ryan Conner, Sonya Mayo, and George Parham (collectively "the Defendants") (Doc. #90).

The Plaintiff filed a Complaint and two amended Complaints in the Circuit Court of Barbour County, Alabama, Clayton Division. After the Second Amended Complaint was filed, the Defendants filed a Notice of Removal on April 30, 2012. The court has federal question jurisdiction over the federal claims, and supplemental jurisdiction over the state law claims. The Plaintiff filed a Third Amended Complaint bringing claims for negligence (Count One); negligent hiring, training, and supervision (Count Two); violation of state statutory law (Count Three and Seven); violation of state statutory law (Count Four); supervisory liability (Count Five); violation of the fourteenth amendment (Count Six); violation of the fourteenth amendment (Count Eight); and fictitious defendants (Count Nine).

After the court ruled on Motions to Dismiss the Third Amended Complaint, the case

proceeded against Barbour County and the Barbour County Commission on federal and state law claims in Counts Four through Eight, state law claims against Defendants Parham, Conner, and Mayo in Counts One and Two, and federal claims of deliberate indifference against Mayo in Counts Six and Seven.   Part of the court's ruling on the Motions to Dismiss included denying state sovereign immunity, finding that the amended state statute did not apply.

The Defendants appealed the state sovereign immunity denial to the Eleventh Circuit Court of Appeals.   The Eleventh Circuit affirmed, finding that the Defendants could not claim immunity under amended Alabama Code § 14-6-1. (Doc. #72).

The case is now before the court on motions for summary judgment.   For reasons to be discussed, the Motion for Summary Judgment filed by Barbour County and the Barbour County Commission is due to be GRANTED, and the Motion for Summary Judgment filed by Ryan Conner, Sonya Mayo, and George Parham is due to be GRANTED in part and DENIED in part.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and    . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.   Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or

by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A),(B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### III. FACTS

On January 31, 2011, Alquwon Johnson, an eighteen-year-old man, was detained in the Barbour County Jail pending trial on charges of first degree robbery.

Defendant Sonya Mayo ("Mayo") is a corrections officer at the jail. Defendant Ryan Conner ("Conner") is the jail administrator. Defendant George Parham ("Parham") is a captain at the jail, and reports to Conner.

On May 5, 2011, Johnson threw a television against a window within the Barbour County Jail. He was moved to a private holding cell. While in the cell, Johnson attempted to commit suicide by hanging himself with a bed sheet. Parham discovered Johnson, who survived the attempt. Parham then placed Johnson on suicide watch. In his deposition, Parham states that

suicide watch means that officers checked on Johnson and logged their observations. (Doc. #103-3 at p.65 5-8).   Parham also removed sheets, towels, and all of Johnson's property from the cell.   (Doc. #103-3 at p. 64:14-22).

Barbour County Jail policy 11.15 states that if an inmate is a suicide risk, proper mental health authorities should be notified and asked to do an evaluation.   No mental health authority was notified about Johnson's suicide attempt.   (Doc. #92-5 at p.196:15-17).

On May 8, 2011, Johnson was moved out of the holding cell to the Special Needs Unit within the jail.   This decision was made by Conner at Parham's recommendation.   Parham has testified that Johnson was removed from suicide watch.   Jail officials have testified that Johnson was placed in Special Needs both because of his suicide attempt and to prevent other jail detainees from harming him.   Conner stated in his deposition that after Johnson "tried to harm himself, we put him in special needs to where there's a closer watch."   (Doc. #92-4 at p. 48:12-14).

The Special Needs Unit is a small block of four cells which has greater visibility than the general population units.

During the time in question, Mayo was working on the second shift at the jail, from 3:00 p.m. to 11:00 p.m.   Part of her duties included supervision of the Special Needs Unit.   Mayo states in an affidavit that she understands that Johnson was placed in the Special Needs Unit because of his suicide attempt and for his safety from other inmates. (Doc. #92-2 at ¶6).   The Plaintiff contends that Mayo was in charge of dispensing Johnson's medications.   Mayo's deposition indicates that she dispensed medications while she was working, but that a prescription medication was dispensed daily at a time before her shift began.

On June 3, 2011, while he was in the Special Needs Unit, Mayo placed Johnson on

lockdown for less than 24 hours for passing a cigarette under the door, which was a rules violation. Lockdown meant that he was placed in a cell, his cell mate was removed, and his door was kept shut. Mayo did not remove bedding from Johnson's cell when she placed him on lockdown. Mayo left the jail at the end of her shift.

On June 4, 2011, at approximately 2:00 p.m. jail officer Karen McNear spoke with Johnson. When Mayo began her shift, at approximately 3:00 p.m., she was told by jail trusties that Johnson had hanged himself. Mayo found Johnson in his lockdown cell where he had committed suicide by hanging himself with his bed sheet.

## IV. DISCUSSION

Some of aspects of the two pending motions for summary judgment have been conceded by the Plaintiff. As to the Motion for Summary Judgment by Barbour County and the Barbour County Commission, the Plaintiff states that upon reviewing the evidence and applicable case law, she agrees that her claims against the County Defendants are due to be dismissed. (Doc. #104). As to the Motion for Summary judgment filed by Defendants Mayo, Conner, and Parham, the Plaintiff concedes that the Motion for Summary Judgment is due to be GRANTED as to the claim in Count Two against Mayo. (Doc. #103 at p.14). The court has reviewed the evidentiary materials submitted and finds no question of fact as to any material issue as to liability raised by Barbour County and the Barbour County Commission or by Defendant Mayo regarding Count II of the Third Amended Complaint as a ground for summary judgment. *See U.S. v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). Summary judgment is, therefore, due to be GRANTED as to Barbour County and the Barbour County Commission, and as to Mayo as to the claim in Count II.

The court now turns to the Motion for Summary Judgment filed by Defendants Mayo, Conner, and Parham as to the remainder of the Plaintiff's claims.

**Federal Claims of Deliberate Indifference**

The Defendants have moved for summary judgment on the deliberate indifference claims against Defendant Mayo on the basis of qualified immunity. Qualified immunity is a protection designed to allow government officials to avoid the expense and disruption of trial. *Ansley v. Heinrich*, 925 F.2d 1339, 1345 (11th Cir.1991). As a preliminary matter, the court must determine whether the public official was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred. *See Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988). Once it is established that a defendant was acting within his discretionary authority, the court must determine whether "[t]aken in a light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "[I]f a constitutional right would have been violated under the plaintiff's version of the facts," the court must then determine "whether the right was clearly established." *Wood v. Kesler,* 323 F.3d 872, 878 (11th Cir. 2003).

Requiring that a constitutional right be clearly established means that liability only attaches if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *United States v. Lanier*, 520 U.S. 259, 270 (1997). In other words, a defendant is entitled to "fair warning" that his conduct deprived his victim of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). A right is considered clearly established "when, at the time of the challenged conduct, '[t]he contours of [a] right are sufficiently clear'" that every "reasonable official would have understood that what he is doing

violates that right.'"  *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations in original).   As the Supreme Court has explained, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*

Apparently it is conceded in this case that Mayo was acting within her discretionary authority.   Therefore, the court turns to the issue of the violation of a constitutional right.

Because Johnson was a pretrial detainee, the Plaintiff's claim is based on the due process clause of the Fourteenth Amendment.  *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir.1994). "[I]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under ... the ... fourteenth amendment, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." *Edwards v. Gilbert*, 867 F.2d 1271, 1274–75 (11th Cir.1989).   The deliberate indifference standard "requires a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir.1990) (emphasis added). "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003) (quoting *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1540 (11th Cir.1994)).   The Plaintiff has to show that Defendant Mayo had "(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] ... that risk; (3) by conduct that is more than mere negligence." *Id.* at 987.   Furthermore, the Plaintiff must show that the Defendant was subjectively aware that the combination of the prisoner's suicidal tendencies and the feasibility of suicide in the detention environment would likely lead to self-harm. *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir.2008).

The Plaintiff has pointed to the evidence to establish deliberate indifference which falls

into three categories: administration of Johnson's medication, Mayo's knowledge of Johnson's suicidal tendencies, and Mayo's violation of jail policies.

**Medicine**

With respect to the administering of Johnson's medicine, the Plaintiff cites to Mayo's deposition during which she was asked whether she ever gave Johnson any of his medications, and she answered that she did, and that sometimes he refused his medication. (Doc. #103-1 at p.24:9-21). In her affidavit, however, Mayo states that she dispensed Johnson's afternoon medication of ibuprofen, which she states he sometimes refused. (Doc. #92-2). She states that she did not dispense the prescription Celexa to Johnson because it was distributed to him during the morning shift. (Doc. #92-2). Mayo also states in her deposition that Celexa was given to Johnson at 6 a.m. which was before Mayo's shift. (Doc. #92-1 at p.36: 13-18).

The Plaintiff contends that Mayo's testimony is inconsistent, and therefore creates a question of fact. Mayo testified "yes" when asked if she ever gave Johnson "any" of his medications, and later denied that she ever gave him medications, but also stated that only ibuprofen was given during her shift. (Doc. #92-1 at p.36:6-19). Mayo also states in her affidavit, however, that she was never informed of the purpose of Johnson's medications, (Doc. #92-2 at p.4), and the court has been pointed to no evidence to the contrary.

Even if there is a question of fact as to whether Mayo gave Johnson prescription medicine, there is no evidence that Mayo was aware that Johnson had medicine for treatment of any psychological disorder, or anything else related to a risk for suicide. Therefore, the court cannot conclude that the evidence of Mayo's actions regarding administration of medicine to Johnson is evidence a subjective knowledge of a risk of serious harm and disregard of that risk by Mayo.

**Knowledge of Suicidal Tendencies**

It apparently is undisputed that Mayo knew that Johnson had unsuccessfully attempted to commit suicide with a bed sheet while housed in a cell in the jail in May, 2011.

While the Defendants argue that it is significant that Johnson's previous suicide attempt was a month before his suicide, Mayo's knowledge of his attempt is evidence of subjective knowledge of a suicidal tendency under Eleventh Circuit precedent. The Eleventh Circuit has reversed a grant of summary judgment to a jailer in part because he subjectively knew that a detainee had attempted suicide "sometime in the last month." *Snow v. City of Citronelle, Al.*, 420 F.3d 1262, 1270 (11th Cir. 2005).

The Plaintiff also argues that Mayo knew that Johnson was placed in the Special Needs Unit because he had attempted to commit suicide, citing to Mayo's deposition. In her deposition Mayo was asked whether she had heard testified earlier that Johnson was placed in that unit because of the suicide attempt, and she answered "yes," and also answered "yes" when asked if that is her understanding of where he needed to be. (Doc. #103-1 at p.30: 14-16). She was also asked as follows: "[w]ell, we know he was put in that block because he – he attempted suicide; right?" To which she responded, "Yes." (Doc. #92-1 at p.63: 12-15). In her affidavit she states "I understand that Alquwon Johnson was placed in the Unit because of his suicide attempt on May 6, 2011 and for his safety from other inmates." (Doc. #92-2). When Conner was asked this question in his deposition: "someone who has attempted suicide, is that – are they supposed to be put in a special-needs unit?," he answered, "[t]hat's what we usually do." (Doc. #92-4 at p. 49: 11-16). He stated that after Johnson "tried to harm himself, we put him in special needs to where there's a closer watch." (Doc. #92-4 at p. 48:12-14). Parham testified in his deposition that they placed Johnson in special needs both because he had attempted suicide and because they were

9

worried about him being injured by other detainees.  (Doc. #92-3 at p.51: 15-21).  He stated that he was placed there so they could "check on him and make sure he was all right."  (Doc. #92-3 at p.51: 9-12).  When asked why they needed to check on Johnson, Parham agreed with the statement that Johnson could have tried to harm himself.  (Doc. #92-3 at p.53: 6-15).  When asked whether the "suicide attempt was still a concern for you," Parham answered "[i]t always would be." (Doc. #92-3 at p. 51:22-52:2).

The Defendants argue that when Mayo informed Johnson that she would put him on lock down on June 3, 2011, he did not threaten suicide or express fear or anxiety, but asked Mayo not to take away canteen privileges and visitation with his mother, so there is no evidence to show that Mayo, at the time she placed Johnson on lock down, thought there was a strong likelihood that Johnson would take his own life.

Although the Defendants maintain that Johnson was taken off of suicide watch, they do not explain what Johnson's status was when he was placed in the Special Needs Unit.  The explanation for his placement in the Special Needs Unit in the evidence before the court is that it was in reaction to threats from inmates, but also was in reaction to his suicide attempt.  As set forth above, jail officials described his placement in Special Needs as being in reaction to his suicide attempt so that they could keep a close watch on him, with the recognition that he might harm himself.  Drawing all reasonable inference in favor of the non-movant, a reasonable jury could conclude that Johnson was housed in the Special Needs Unit as a preventative measure against suicide, because he was considered to be suicidal.  The fact that there is evidence that Johnson was taken off of official suicide watch does not remove the question of fact as to whether Johnson was considered a suicide risk.  The court concludes, therefore, that there is evidence that Mayo subjectively knew that Johnson was a suicide risk.

**Jail Policy**

The Plaintiff states that Mayo violated jail policy when she put Johnson on lock down the night before he committed suicide. The Plaintiff points to policy 10.06 of the Barbour County Jail, entitled Pre-Hearing Lockdown and Segregation, which says that inmates are entitled to a disciplinary hearing, and that all pretrial lockdowns must be approved by the Shift Supervisor and documented. The Plaintiff also states that Mayo did not complete an incident report.

The Defendants also point to jail policy and state that Mayo acted in accordance with policy by placing Johnson on lock-down. They cite to Administrator Connor's deposition in which he states that jail officers "have the right, if they see a rule like that that's broken within the jail, they're allowed to punish them by either lockdown or take visitation or commissary or whatever." (Doc. #92-4 at p. 132: 16-21).

The Plaintiff also states that Mayo violated policy 11.15 by failing to remove the implements of suicide and by not housing him with other inmates. The Defendants argue, however, that Johnson had been taken off of suicide watch by Mayo's superiors and during his time in the Special Needs Unit he had not expressed suicidal ideation or threats.

A provision of jail policy regarding "Admission and Booking of Inmates" is that a member of the "staff shall closely monitor all persons deemed to be suicide risks." (Doc. #92-21). The jail policy for Suicide Prevention states that if a person is "detected to be a suicide risk," a mental health evaluation should be done, and until that time, the staff should closely observe the inmate. (Doc. #92-22). Under the policy regarding Housing under Suicide Prevention, if a person has been determined to be an "imminent danger" to himself, he should be housed "if possible" in a cell with other inmates. If a person "displaying suicidal tendencies" is housed in an administrative segregation cell, he should be closely monitored by a member of the staff, and if a trusty is utilized,

the staff should observe the inmate's behavior every 15 minutes. (Doc. #92-22).

It appears to the court that the question of fact as to Johnson's status while placed in the Special Needs Unit means that the suicide provisions of jail policy arguably applied to Johnson. Of course, whether or not Mayo was acting in conformity with policy is not the issue. The issue was whether she acted with deliberate indifference. In other words, Mayo's actions are judged against a constitutional standard of deliberate indifference, not whether she complied with jail policy. *See, e.g., Stallworth v. Huffman*, No. Civ. A. 07-0439-KD-B, 2008 WL 2858591, at \*15 (S.D. Ala. July 22, 2008). The court will, therefore, consider evidence of Mayo's actions within that context.

**Analysis of evidence under *Snow***

The court will consider the evidence of Mayo's actions and knowledge within the analytical framework used by the Eleventh Circuit's decision *Snow v. City of Citronelle, Al.*, 420 F.3d 1262 (11th Cir. 2005). In *Snow*, a jail detainee committed suicide by hanging herself in her cell and a claim of deliberate indifference was brought against jail officials. The court found the following factors to preclude summary judgment for one jailer on the deliberate indifference claim: the defendant jailer was told by a jailer in another facility that the detainee had tried to cut her wrist within the last month, the jailer told the detainee's family that she was suicidal, the jailer did not tell anyone at the jail that he thought the detainee was a suicide risk, the jailer did not take actions he would have taken if he regarded someone as a suicide risk, such as removing items from the cell, telling someone to check on her every fifteen minutes, placing the detainee in a drunk tank, or returning her to a medical facility. *Snow,* 420 F.3d at 1270. Summary judgment was, however, affirmed as to an officer who knew only that the detainee had attempted to commit suicide at some unspecified time in the past, but who was not aware that the decedent had

expressed suicidal ideation.  *Id.* at 1269.   The court expressly stated that knowledge of a previous suicide attempt without more was not sufficient to put that officer on notice of a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.  *Id.*

As noted above, Mayo knew that Johnson had attempted suicide a month before his death with a bed sheet when he was housed alone in a cell.   Also as outlined above, when viewed in a light most favorable to the non-movant, there is evidence from which a reasonable factfinder could conclude that Johnson was placed in the Special Needs Unit because he was considered to be a suicide risk, and that Mayo was aware of the reason for his placement.   The court recognizes that Johnson did not engage in erratic behavior when Mayo placed him on lockdown, but that does not made the analysis is *Snow* inapplicable.   In *Snow*, the Eleventh Circuit found sufficient evidence of subjective knowledge of a strong risk that a detainee would commit suicide based on the following:   a jailer told the defendant that the detainee had tried to cut her wrist while in custody within the last month and caused trouble, and the defendant jailer told the detainee's parents that the detainee was suicidal. *Id.* at 1270.   Under *Snow*, viewing the evidence in a light most favorable to the non-movant, there is sufficient evidence for a finder of fact to conclude that Mayo had subjective knowledge of a strong risk that Johnson would commit suicide.

Also in *Snow*, the court also found evidence of deliberate indifference, in fact concluding that the jailer did nothing to prevent suicide because he did not communicate his belief that the detainee was a suicide risk and did not inform others to check on the detainee every fifteen minutes, did not remove items from the cell with which she could have harmed herself, or take any other actions. *Id.*   In this case, Mayo placed Johnson in a cell by himself, did not remove items with which he could have harmed himself, monitor him closely, or tell anyone to monitor him closely.   In other words, Mayo also did not take any action to prevent Johnson from committing

13

suicide. Here, as in *Snow*, when the facts are viewed in a light most favorable to the non-movant, "a jury could find that [Mayo] subjectively believed that there was a strong risk that [Johnson] would attempt suicide and deliberately did not take any action to prevent [his] suicide," which facts would be a constitutional violation. *Id.* at 1270. Furthermore, the Eleventh Circuit held in *Snow* that it is clearly established that an officer's deliberate indifference to the risk of serious harm to a detainee is a violation of the Fourteenth Amendment. Therefore, summary judgment is due to be DENIED as to the Fourteenth Amendment claim against Mayo.

### State Law Claims

The Defendants move for summary judgment on the state law claims in the Third Amended Complaint on the following grounds: as to Count One, Mayo is entitled to State-agent immunity; as to Count Two, Mayo and Parham were not in charge of hiring, training, and did not have supervisory status; and as to Counts One and Two, there is no evidence of proximate cause.

As earlier noted, the Plaintiff concedes that summary judgment is due to be granted as to Mayo on Count Two. The court, therefore, turns to the grounds for summary judgment as to the claim against Mayo in Count One, and as to Parham and Conner in Counts One and Two.

    A.   State Law Claim in Count One against Mayo

As to the claim in Count One, the Defendants argue that Mayo is entitled to State-agent immunity. In order to claim State-agent immunity, a defendant bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle him or her to immunity. *Ex parte Wood*, 852 So.2d 705, 709 (Ala.2002). The burden then shifts to the plaintiff, who, in order to deny the defendant immunity from suit, must establish that the defendant acted willfully, maliciously,

14

fraudulently, in bad faith, or beyond authority. *Ex parte Wood*, 852 So.2d at 709. A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Ex parte Butts*, 775 So.2d 173, 178 (Ala.2000).

In *Howard v. City of Atmore*, 887 So.2d 201 (2003), a case relied on by the Defendants, a jailer was not deprived of State-agent immunity for failing to follow a policy of making checks of mental health risks and suicidal risks because whether the inmate fell into those categories was a judgment which had to be made on a case-by-case basis. *Howard*, 887 So. 2d at 209. In that case, however, the jailer was said to act beyond his authority where he failed to follow the jail policy which required jail check of all inmates twice per hour and constant observation of the monitor camera. *Id.* That jail policy did not turn on a subjective assessment of individual inmates or contemplate the exercise of judgment. *Id.*

The Plaintiff concedes that Mayo met her initial burden of showing that Plaintiff's claims arise from a function that would generally entitled her to State-agent immunity, but argues that Mayo acted beyond her authority when she placed Johnson on lockdown on the night of June 3, 2011.

The Barbour County jail policy, as set out above, states that if a person has been determined to be an imminent danger to himself, he should be housed "if possible" in a cell with other inmates and closely monitored. (Doc. #92-22 at p.3). Also under the policy, if it is necessary for a person "displaying suicidal tendencies" to be "housed in an administrative segregation cell," the inmate should be closely monitored by a member of the staff, and if a trusty is utilized, the staff should observe the inmate's behavior every 15 minutes. (Doc. #92-22 at p.3).

When the facts in this case are viewed in a light most favorable to the non-movant, Mayo

15

did not have to exercise discretion to determine whether Johnson was suicidal, because he had been placed in the Special Needs Unit due to his suicide attempt.   While there is evidence that Johnson had been taken off of suicide watch, the policy as written does not specify requirements limited to a designation of "suicide watch," but instead is written as applying to inmates determined to be an imminent threat of harm to themselves or with suicidal tendencies.   It appears that under the policy, Johnson should have received close monitoring while on lockdown, and there is no evidence before the court that such monitoring occurred.   Therefore, the court finds that genuine issues of fact preclude summary judgment as to Mayo on the ground of State-agent immunity.

      B.  State Law Claim Against Parham and Conner

The Defendants also argue that judgment is due to be entered as to Parham on Count Two because there is no evidence that Parham was in charge of hiring or training and that it was a different employee, Lieutenant Derrick Rodgers ('Rodgers"), whose job it was to oversee inmates in general population including the Special Needs Unit.

The Plaintiff responds that Parham testified in his deposition that as part of his duties he worked under Conner, the Jail Administrator, and he would "check things out, look at things, make decision on things," and report his findings to Conner.   (Doc. #103-3 at p.29: 17-20).   The Plaintiff also points to testimony that Rodgers reported to Parham. (Doc. #103-4 at p.28: 4-6). The Plaintiff points to Parham's deposition testimony that he made the recommendation to transfer Johnson to the Special Needs Unit after he attempted suicide.   (Doc. #103-3 at p.83:5-9). Parham also testified in his deposition that he normally does a walk-though on a daily basis, either when he comes on duty or sometime during the day and that he checked on Johnson when he was in the Special Needs Unit. (Doc. #103-3 at p.91-92).   The Plaintiff argues, therefore, that there is

16

sufficient evidence that Parham had a supervisory role at the jail.

The Defendants did not respond to this evidence and argument in their reply. The court concludes, given the evidence of supervision of the Special Needs Unit by Parham, that summary judgment is due to be GRANTED as to negligent hiring and training, but DENIED as to negligent supervision.

The Defendants also argue that judgment is due on Counts One and Two because there is no evidence that an act by the Defendants proximately caused Johnson's suicide. They contend that the allegation is that Conner and Parham are liable for failing to contact mental health services, but there is no evidence that failure to contact mental health services was the cause of Johnson's suicide. They also argue that the Plaintiff must present expert testimony establishing a causal connection, citing *Patton v. Thompson*, 958 So. 2d 303, 311 (Ala. 2006).

The Plaintiff states that proximate cause is a question for the jury and that the expert's evidence, Dr. Lindsay Hayes, is that the actions and inactions of the Defendants, including ignoring Johnson, leaving him unobserved with possessions later used to commit suicide, and never referring him to a mental health professional were a proximate cause of his suicide. (Doc. #103-10 at p.22). In light of the testimony by the Plaintiff's expert, the court concludes that summary judgment cannot be granted to the Defendants on the issue of evidence of proximate cause.

## V. CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1. The Motion for Summary Judgment filed by Barbour County and the Barbour County Commission is GRANTED, and judgment is entered in favor of Barbour County and the Barbour County Commission and against the Plaintiff.

2. The Motion for Summary Judgment filed by Ryan Conner, Sonya Mayo, and George Parham is GRANTED in part and DENIED in part as follows:

   a. Judgment is entered as to Mayo and against the Plaintiff on the claim in Count Two, and in favor of Parham and against the Plaintiff on the negligent hiring and training claim in Count Two.

   b. Summary Judgment is denied as to all other claims.

The case will proceed to trial on the federal deliberate indifference claims in Counts Six and Seven against Mayo, the state law negligence claim in Count One against Mayo, Parham, and Conner, and the state law claims in Count Two for negligent hiring, training, and supervision against Conner, and for negligent supervision against Parham.

Done this 17th day of February, 2015.

/s/ W. Harold Albritton
W.   HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE